UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                Plaintiff,                    Case No.  21-20638

v.

                                            Hon. Sean F. Cox


JOSEPH TODD KOWALCZYK,

                Defendant.

_____/

## JOSEPH KOWALCZYK'S SENTENCING MEMORANDUM

Joseph Kowalczyk is a young man with low intellectual functioning, who has battled symptoms of mental health issues since he was a teenager and turned to drugs, alcohol, and attention-seeking behavior as means to cope.  In the months prior to this offense, a series of traumatic events triggered an increase of mental health symptoms and lead to a destructive downward spiral. In May 2020, Joe was lonely, anxious, depressed, and unmedicated. He sent a threating message without fully appreciating the impact it would have on others.  Over the past two years, however, Joe has grown, matured and learned to recognize when to reach out for help instead of acting out in self-destructive ways.

During the past two years, this Court gave Joe a huge wake-up call by revoking his bond and sending him to jail, where he spent 90% of his time in isolation due to a mental health crisis. Following his time in jail, the court also gave Joe an opportunity to

access intensive mental health and substance abuse treatment at Team Jefferson. Since March 2022, Joe has been in an intensive program, where he is not able to come and go as he wishes. He attends regular group and individual therapy sessions for his dual diagnoses. Although mental health and alcohol abuse will be lifelong struggles for him, Joe has gained maturity and insight, so that he now calls a friend from Alcoholics Anonymous or a therapist rather than self-harm or online attention-seeking.

The Guidelines as calculated by the Probation Department are 0–6 months, and a sentence within that range of time served followed by one year of supervised release is sufficient, but not greater than necessary, to achieve the objectives of punishment.

## A. Joe's Childhood Was Marked by Instability

Joe is only 21 years old. He is the third of six children. He was raised primarily by his mother, Melissa Thompson, who has given Joe both love and support throughout his life. His mother and father divorced in large part because of his father's mental health issues. Joe's father has not maintained regular contact with Joe and was not involved in raising him. Ms. Thompson remarried when Joe was two years old, and his stepfather has become an additional source of love and support.

Joe's childhood was marked by extreme instability. In addition to his parents' divorce, the family had to move frequently because of extreme financial distress. These frequent moves destabilized Joe's education and emotional stability.

## B. Joe's Struggles in School

From the outset, Joe struggled academically. In the first grade, his teachers determined that he was in need of an Individualized Education Plan (IEP) and specialized speech and language classes because of his intellectual disabilities. Joe was placed in special classrooms, permitted extra time, and offered additional speech and language services. Joe's limited social skills and intellectual functioning made school a difficult place to be. He was bullied by peers and spent most of his time in school feeling completely inadequate.  By middle school and early high school, Joe began developing depression and anxiety.

Joe began high school, but by the time he was in 10th grade, he was failing nearly all subjects because of severe depression and crippling anxiety. His GPA was 0.3.  At that same time, Joe reported that he started cutting himself and having frequent thoughts of suicide. Since that time, he has not been able to return to school to complete his high school diploma.

Throughout school, Joe was susceptible to significant bullying and peer pressure. He was very influenced by his peers—often to his own detriment. When Joe failed all his classes, he became isolated, anxious, and depressed. In May 2016, he was hospitalized for suicidality.

The one bright spot Joe remembers from childhood was wrestling. He was a member of the high school team and even hoped to wrestle professionally one day.

### C. Joe's Intellectual Disability

When it became clear to Joe's parents that he would have significant difficulty completing high school and finding employment because of his borderline intellectual functioning, severe depression, and anxiety, Ms. Thompson filed an application so that he could receive Social Security Disability income and benefits. In July 2019, an administrative law judge concluded that he was and had been disabled since age 14.

When Joe was 14, he submitted to an IQ test for the purposes of determining whether he should receive SSD benefits. At that time, his Full Scale IQ was 70, which is considered to be borderline intellectual functioning.[1] (Ex. B, Boneff Report (SEALED)) His total language skills placed him in the fourth percentile compared to his peers.

Intellectual disability is an appropriate diagnosis when a person's conceptual, social, and practical functioning are limited.[2] People like Joe with mild intellectual disability have difficulty learning academic skills and struggle with abstract thinking and executive function.[3] They are socially immature and have a difficult time reading peers'

---

[1] A diagnosis of intellectual disability has historically been a total IQ score of 70 or below in combination with deficits in adaptive skills. Comm. to Evaluate the Supp. Sec. Income Disability Program for Children with Mental Disorders, et. al., (Boat &, Wu eds.), *Mental Disorders and Disabilities Among Low-Income Children, Clinical Characteristics of Intellectual Disabilities* (2015), available at https://perma.cc/5LJT-2LG7.

[2] Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders—DSM V* 33 (5th ed. 2013).

[3] *Id.* at 34.

social cues, assessing risks, and regulating their behavior appropriately.[4] In short, their social judgment is immature for their age, they have difficulty identifying the line between appropriate and inappropriate behavior, and they struggle to understand the consequences of their actions.

The combination of low intellectual functioning, inadequate access to health care, and a chaotic home life have made transitioning into adulthood difficult for Joe. He has low self-esteem and difficulty finding and maintaining a job. Atara Abramsky, Ph.D., evaluated Joe, and she explains how these factors have impacted his maturation. (Ex. A, Abramsky Report (SEALED))

As Dr. Abramsky explains, Joe's maturity does not match his chronological age, and his behavior a year ago reflects that fact. Joe never had any intent to hurt, injure, or scare anyone. In his mind, the tweet was a joke made out of boredom and feeling isolated and depressed. His behavior was that of an immature person seeking attention. The anti-government sentiments communicated in those tweets were the product of watching a Netflix show, not a long-standing belief. Indeed, Joe has used Twitter very little at all. Before March 2020, he had not written anything for nearly two years. The content was almost exclusively focused on wrestling—one of Joe's passions.

---

[4] *Id.*

## D. Traumatic Events Leading Up to May 2020

In the year preceding Joe's online conduct, he experienced two significant traumatic events. In June 2019, Joe was struck by a car when he was crossing the road after an evening of drinking. The driver left the scene, and police found Joe crawling in the road. Emergency room doctors treated him for a fracture of the right orbital roof bone, a right clavicle fracture, a head injury.

Just two months later, in August 2019, Joe's friend accidentally shot him in the right eye with a BB gun. Joe lost vision in his right eye completely. He had surgery in October 2019. Despite a successful surgery, doctors do not believe Joe will be able to see out of his right eye again.

These traumatic events increased Joe's anxiety and sense of isolation. He was angry and depressed because these injuries limited his ability to wrestle, which was one of the few activities that gave Joe a sense of purpose and joy. He long hoped to become a professional wrestler or wrestling referee. The injuries to Joe's head, shoulder, and eye made participating in wrestling impossible and rendered his future participation in the sport uncertain.

These traumatic injuries led to another episode of severe depression. In September 2019, Joe's therapist at Easter Seals petitioned for his hospitalization due to suicidality. After discharging from the hospital, Joe began to isolate himself further. He stopped attending treatment. His sense of isolation, anger, and anxiety grew.

Just five months after Joe's eye surgery, the Governor issued a stay-at-home order in response to the COVID-19 global pandemic. Numerous studies have shown that the pandemic has taken a toll on millions of people.[5] Physical distancing and social isolation affected everyone. And Joe had to cope with these changes at the same time he was coming to terms with the loss of his eye and the long-term effects of the car accident.

Joe responded to feeling isolated and distressed by seeking attention online. Because of his intellectual disability, immaturity, and difficulty identifying risks and social cues, he did not recognize that his social media conduct had gone too far. Even when the FBI agents came to his house initially, he did not appreciate the seriousness of the situation. Joe's subsequent arrest, supervision, time in custody, and time at Team Jefferson have made the point.

**E. Joe's Conduct Since Arrest**

During Joe's initial appearance, he had a severe anxiety attack. After he returned home and news of his arrest and conduct appeared online, he continued to feel horrible about what he had done. He knew that he had disappointed his parents and severely impacted their lives. Adding to the stress, was the fact that the manager of their trailer park threatened to evict his family because of his conduct. This was a constant threat

---

[5] World Health Org., *The impact of COVID-19 on mental health cannot be made light of* (June 16, 2022), available at https://perma.cc/A3P7-6DPF; Kira M. Newman, *Seven Ways the Pandemic Is Affecting Our Mental Health*, Greater Good Magazine (Aug. 11, 2020), available at https://perma.cc/QS55-UP58.

for nearly a year. The consequences of Joe's conduct were immediate and very clear to him.

Initially, Joe struggled with coping with depression, low self-esteem and increased anxiety over his behavior and its impact on his and his family's life. This time, however, he responded with maturity. For nearly two years, Joe regularly attended treatment and therapy sessions. He has not posted on social media this entire time. As his mother explains, this was a wake-up call. (Ex. C, Thompson Ltr.)

At the end of January 2022, Joe went off the rails. His grandfather and uncle with whom he was living died because of COVID-19 on the same day. He had stopped taking his medications earlier because he was doing so well. But Joe struggled to cope with the sudden loss, and he started drinking heavily. Ultimately, he was hospitalized at Havenwyck because of suicidality. In March 2022, this Court detained Joe for 12 days. This was an extremely difficult period of time. Joe was afraid. But it also sent an effective message: if he did not take his mental health treatment seriously, there would be severe consequences. Since that time, he has been at Team Jefferson, where he is receiving treatment for his dual mental health and substance use disorder diagnoses. While Team Jefferson has not always been the most conducive environment for change, Joe has worked with his treatment team to learn effective strategies to address increased stress and its impact on his sobriety.

The best treatment for Joe at this point in his recovery is in an outpatient program with the assistance of a case worker and Alcoholics Anonymous. When Joe

8

leaves Team Jefferson, he has a supportive network waiting for him. He can live with his family in the home he bought for them with the money he received from settlement of the civil suit for being shot. The is a drug and alcohol-free home. His family owns a business, and he will help his parents run it. Perhaps most surprisingly to Joe is that he now wants to study to earn his GED. Although he knows studying for and passing the exam will be challenging, he wants to further his education because he now sees a future for himself.

Joe will also have the assistance of a case worker. Case management is a critical piece of mental health services that Joe has never had available to him in the past. Ms. Tracey Blevins will be working with Joe to develop an individualized treatment plan, where he sets goals for housing, treatment, employment, benefits and anything else he needs to remain healthy and stable in the community. She will meet with him at least once per week and will be available to him by phone on a regular basis. She will also help him manage his appointments with his therapist and psychiatrist. He will meet with a therapist weekly or biweekly depending on the clinician's assessment of the level of care needed. Having access to a case manager to help navigate various treatment appointments, manage medications, and connect with other supportive services will help Joe maintain stability and succeed in the community with the limitations he has. Joe's family—particularly his mother—are committed to helping him succeed at home.

Joe also has a group of people at AA waiting to help him with recovery. Three of the friends Joe made in AA, including Joe's sponsor, have written to explain how

active he has been at meetings, their contact with him, and their commitment to help him with recovery. (Ex. D, Sheehan Ltr., Ex. E, Hanes Ltr., Ex. F, Mecaj Ltr.) In short, Joe is on the right path.

### F.  An Appropriate Sentence

The Guidelines recommend a sentence between 0–6 months. A within-Guidelines sentence of time served followed by one year of supervised release achieves the objectives of sentencing: retribution, deterrence, incapacitation, and rehabilitation.

Joe acknowledges that his conduct was serious. An arrest, court supervision, and jail time have hammered that message home. Although his message was deeply concerning, there is no evidence that he intended to carry out a threat or harm others. His comments were not the product of deep-seeded beliefs or animus; he was lonely, anxious, and seeking attention in a destructive way. Additional time in custody is not necessary to emphasize the seriousness of the offense.

During the over two years of court supervision, Joe has abstained from posting on social media. This demonstrates that non-custodial sanctions can and do effectively deter Joe and prevent him from engaging in similar conduct. A condition requiring that Joe not post on social media is an appropriate and effective mechanism to ensure he does not do this again in the future.

Joe has made strides learning how to manage his mental health conditions and substance abuse disorder, and a custodial sentence would interrupt that progress. Continued treatment in the community is the most effective manner to address these

issues. The Sentencing Reform Act precludes sentencing courts from imposing or lengthening a prison term to promote an offender's rehabilitation. *Tapia v. United States*, 564 U.S. 319, 327 (2011). Congress "barred courts from considering rehabilitation in imposing prison terms . . . but not in ordering other kinds of sentences. [T]he purpose of rehabilitation. . . is still important in determining whether a sanction *other than a term of imprisonment* is appropriate in a particular case." (cleaned up, emphasis in original). Joe is currently connected with effective treatment, and this Court should require that he continue with his medication regimen and therapy as directed.

## CONCLUSION

A sentence within that range of time served followed by one year of supervised release is appropriate punishment. The Court should allow Joe to return home with his family to continue outpatient treatment for supervised release with the conditions recommended by the Probation Department (PSR ¶¶82–85), as well as a condition not to post on any social media.

Respectfully submitted,

**FEDERAL COMMUNITY DEFENDER**

s/Colleen P. Fitzharris
Attorney for Joseph Todd Kowalczyk
613 Abbott Street, Suite 500
Detroit, Michigan 48226
313-967-5868
E-mail: colleen_fitzharris@fd.org

Date: August 12, 2022

11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                    Plaintiff,                    Case No.  21-20638

v.
                                                  Hon. Sean F. Cox


JOSEPH TODD KOWALCZYK,

                    Defendant.

_____/

## CERTIFICATE OF SERVICE

    I hereby certify that on August 12, 2022, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

                    Alyse Wu
                    Assistant United States Attorney
                    United States Attorney's Office
                    211 W. Fort Street, Suite 2001
                    Detroit, Michigan 48226


                    Respectfully submitted,

                    **FEDERAL COMMUNITY DEFENDER**


                    s/Colleen P. Fitzharris
                    Attorney for Joseph Todd Kowalczyk
                    613 Abbott Street, Suite 500
                    Detroit, Michigan 48226
                    313-967-5868
                    E-mail: colleen_fitzharris@fd.org

Date:  August 12, 2022